Opinion
 

 VOGEL (Miriam A.), J.
 

 This is a tax case, in which the question is whether Platform Gail, a partially built oil drilling platform, was “delivered” to its purchaser when the original builder’s cost overruns and other construction problems required a mid-construction switch to a new builder. Our answer is “no,” which means Platform Gail was not delivered within this state, which in turn means there was no taxable event for California sales tax purposes, which in turn means we reverse the trial court’s judgment, with directions to enter judgment for the purchaser.
 
 [1]
 

 Facts
 

 Chevron U.S.A., Inc., leased an area of ocean floor off the coast of Southern California from the United States Department of Interior, Bureau of Land Management. As part of the deal, Chevron was obligated to erect and maintain offshore oil drilling facilities at the site, including the topside platform referred to by the parties as Platform Gail, and to pay rent that
 
 *292
 
 included a royalty on the value of minerals and other products extracted from the site. At the end of the lease, Chevron was obligated to remove the drilling facilities, including Platform Gail.
 

 In 1985, Chevron retained Atkinson Mechanical Contractors Company to build Platform Gail, a 30,000-ton, 50,000-square-foot, four-deck structure. Under the terms of the Chevron-Atkinson contract, Atkinson was to build Platform Gail, deliver it via common carrier to the out-of-state offshore site, and fasten it to an underwater foundation furnished and installed by others, an arrangement made to exempt the transaction from California sales taxes under Revenue and Taxation Code section 6396
 
 [2]
 
 (gross receipts from the sale of personal property are exempt if the property is delivered outside the state). The contract price—$21,951,453—suggests the exemption was a significant deal point.
 
 [3]
 
 Atkinson agreed to file all required tax returns and reports and to pay all taxes (not just sales taxes) imposed pursuant to this contract. Chevron, in turn, agreed to furnish to Atkinson an exemption certificate certifying that Platform Gail was to be shipped “to the Outer Continental Shelf beyond the State’s territorial waters, for the purposes of meeting State sales and use tax exemption requirements.”
 

 In addition, Atkinson agreed to indemnify Chevron against any tax liability, with one exception. If, as permitted by the contract, Chevron terminated Atkinson’s performance before completion of Platform Gail,
 
 [4]
 
 Chevron agreed to “reimburse [Atkinson] for any U.S. federal, state, or local sales or use tax that becomes payable as a result of [Chevron’s] taking possession of [Platform Gail]” at the time of Atkinson’s termination. As will appear, the contract was terminated before completion. Had that not occurred, the contract contemplated that, upon completion of Platform Gail, Chevron would inspect the work, require such changes as it deemed necessary and, after satisfactory completion of the work as corrected, issue to Atkinson an “acceptance certificate” (along with any retained payments).
 

 Atkinson began its work on Platform Gail during the second half of 1985, at a construction site in Stockton, California (leased by Atkinson from
 
 *293
 
 Sohio, Inc.). Under the Chevron-Atkinson contract, Atkinson was responsible for all security at the construction site, and assumed all risk of liability for property damage and personal injury until Platform Gail was accepted by Chevron. To that end, Atkinson was required to (and did) maintain half a dozen types of insurance, all for the benefit of Chevron. Within a matter of months, however, disputes arose between Chevron and Atkinson about delays and cost overruns, and in September 1986, by mutual agreement, Atkinson stopped work on Platform Gail but, at Chevron’s request, remained on the worksite. Within a few weeks, Chevron and Atkinson entered an interim services agreement to avoid further delays while Chevron finalized arrangements with Kaiser Steel Corporation to replace Atkinson. On December 1, Chevron and Kaiser signed a contract for Kaiser’s completion and delivery of Platform Gail, on terms and conditions virtually identical to those in the Chevron/Atkinson contract. Between September and December, Chevron made the worksite lease payments due to Sohio and, after the Atkinson-Sohio lease expired, Chevron entered a new lease with Sohio for the same worksite.
 

 Platform Gail was completed during the summer of 1987, and delivered by Kaiser to a carrier for transport to the offshore site. In August, the carrier towed Platform Gail from Stockton to the coast of Southern California, where it was fastened to its offshore foundation and commissioned. By this time, Chevron had paid about $48 million for labor and materials—$30 million to Atkinson ($8 million more than the original contract price for a completed platform) and $18 million to Kaiser to complete Platform Gail.
 

 In June 1989, the State Board of Equalization notified Atkinson that it owed $1,798,449 in sales taxes for its partial fabrication of Platform Gail, payable (according to the Board) because Chevron had taken possession or delivery of the incomplete platform within California when Atkinson was terminated and Kaiser was retained. In short, the Board determined the transaction was not exempt under section 6396, notwithstanding that (as the Board concedes) the transaction would have been exempt had Atkinson completed the work and (as required by Atkinson’s contract with Chevron) delivered Platform Gail to a common carrier for out-of-state delivery to Chevron.
 

 In September, Chevron paid the taxes on behalf of Atkinson ($1,798,449, plus interest of $604,389, a total of $2,402,838), and timely pursued a claim for a refund. When Chevron’s claim was denied, it filed this action challenging the Board’s decision. The trial court rendered judgment for the Board, and Chevron appeals.
 

 
 *294
 
 Discussion
 

 Chevron contends the change in contractors did not constitute a delivery in California within the meaning of section 6396, and that the transaction is exempt. We agree.
 

 A.
 
 The Statute
 

 Section 6396 provides thus: “There are exempted from the computation of the amount of the sales tax the gross receipts from the sale of tangible
 
 personal property which, pursuant to the contract of sale, is required to be shipped and is shipped to a point outside this state by the retailer
 
 by means of: (a) facilities operated by the retailer, or (b) delivery by the retailer to a carrier, customs broker or forwarding agent, whether hired by the purchaser or not, for shipment to such out-of-state point. [¶ For purposes of this section, the term ‘carrier’ shall mean a person or firm engaged in the business of transporting for compensation tangible personal property owned by other persons, and includes both common and contract carriers. The term ‘forwarding agent’ shall mean a person or firm engaged in the business of preparing property for shipment or arranging for its shipment.” (Italics added.)
 

 B.
 
 The Regulations
 

 To aid in the interpretation of section 6396, the Board has adopted regulation 1620 (Cal. Code Regs., tit. 18, § 1620).
 
 [5]
 
 As relevant, the regulation includes the following provisions:
 

 “When a sale occurs in this state, the sales tax, if otherwise applicable, is not rendered inapplicable solely because the sale follows a movement of the property into this state from a point beyond its borders, or precedes a movement of the property from within this state to a point outside its borders. Such movements prevent application of the tax only when conditions exist under which the taxing of the sale, or the gross receipts derived therefrom, is prohibited by the United States Constitution or there exists a statutory exemption.
 
 If title to the property sold passes to the purchaser at a point outside this state, or if for any other reason the sale occurs outside this state, the sales tax does not apply, regardless of the extent of the retailer’s participation in California in relation to the transaction. The retailer has the burden of proving facts establishing his right to exemption.”
 
 (Reg. 1620, subd. (a)(1), italics added.)
 

 “Except as otherwise provided . . . below, sales tax applies when the property is delivered to the purchaser or the purchaser’s representative in this
 
 
 *295
 

 state, whether or not the disclosed or undisclosed intention of the purchaser is to transport the property to a point outside this state,
 
 and whether or not the property is actually so transported.
 
 It is immaterial that the contract of sale may have called for the shipment by the retailer of the property to a point outside this state, or that the property was made to specifications for out-of-state jobs,
 
 that prices were quoted including transportation charges to out-of-state points, or that the goods are delivered to the purchaser in this state via a route a portion of which is outside this state.
 
 Regardless of the documentary evidence held by the retailer ... to show delivery of the property was made to a carrier for shipment to a point outside the state, tax will apply if the property is diverted in transit to the purchaser or his representative in this state, or for any other reason it is not delivered outside this state.”
 
 (Reg. 1620, subd. (a)(3)(A), italics added.)
 

 “Sales tax does not apply when the property pursuant to the contract of sale, is required to be shipped and is shipped to a point outside this state by the retailer
 
 by means of: [¶ 1. [facilities operated by the retailer, or [¶ 2. [d]elivery by the retailer to a carrier, customs broker or forwarding agent, whether hired by the purchaser or not, for shipment to such out-of-state point. . . .” (Reg. 1620, subd. (a)(3)(B), italics added.)
 

 C.
 
 The Interstate Commerce Clause
 

 “[S]ection 6396 is designed to accommodate federal constitutional restrictions on state taxation of sales in interstate commerce.”
 
 (Engs Motor Truck Co.
 
 v.
 
 State Bd. of Equalization
 
 (1987) 189 Cal.App.3d 1458, 1467-1468 [235 Cal.Rptr. 117].) This is necessary because the interstate commerce clause of the Constitution of the United States, article I, section 8, restricts the taxation of sales of goods in interstate commerce, and permits a state to require a local seller to collect and remit a tax on receipts from sales made to out-of-state customers only if the sale itself can be sufficiently connected with the taxing state. Delivery within the taxing state can establish such a nexus.
 
 (Satco, Inc.
 
 v.
 
 State Bd. of Equalization
 
 (1983) 144 Cal.App.3d 12, 16 [192 Cal.Rptr. 449];
 
 Dept, of Treasury
 
 v.
 
 Wood Corp.
 
 (1941) 313 U.S. 62, 68 [61 S.Ct. 885, 888, 85 L.Ed. 1188,].) For these reasons, California must exempt sales which, although in other respects transacted in California, are consummated by delivery to the buyer outside the state.
 
 (Engs Motor Truck Co.
 
 v.
 
 State Bd. of Equalization, supra,
 
 189 Cal.App.3d at p. 1468.)
 

 It follows, in our view, that the general rules of construction governing tax exemptions—exemptions are to be construed liberally in favor of the Board and strictly against the taxpayer
 
 (Beatrice Co.
 
 v.
 
 State Bd. of Equalization
 
 (1993) 6 Cal.4th 767, 775 [25 Cal.Rptr.2d 438, 863 P.2d 683] [considering
 
 *296
 
 an exemption for transfers of property to a newly formed corporation];
 
 Standard Oil Co.
 
 v.
 
 State Bd. of Equalization
 
 (1974) 39 Cal.App.3d 765, 769 [114 Cal.Rptr. 571] [considering an exemption for gas, electricity and water delivered through mains, lines or pipes])—must be applied to section 6396 with a light hand, with due deference to the overriding protections afforded by the interstate commerce clause.
 
 (Clare
 
 v.
 
 State Bd. of Accountancy
 
 (1992) 10 Cal.App.4th 294, 303 [12 Cal.Rptr.2d 481] [a statute will be construed to preserve its constitutionality].)
 

 With this framework in mind, we review the statutory scheme de novo
 
 (Rudd
 
 v.
 
 California Casualty Gen. Ins. Co.
 
 (1990) 219 Cal.App.3d 948, 951 [268 Cal.Rptr. 624]) to determine whether the Board, in making the assessment against Atkinson, properly interpreted section 6396 and its implementing regulations, giving due weight to the Board’s interpretation but recognizing that the ultimate question is one of law for us to decide.
 
 (Culligan Water Conditioning
 
 v.
 
 State Bd. of Equalization
 
 (1976) 17 Cal.3d 86, 93 [130 Cal.Rptr. 321, 550 P.2d 593].)
 

 D.
 

 The trial court found that the exemption requirements of section 6396 were not met when Chevron replaced Atkinson with Kaiser (because, according to the trial court’s findings, this substitution involved a “delivery” of the partially built platform to Chevron within California), and that a taxable sale occurred at that time. Chevron contends it did not take possession of or title to Platform Gail until it was completed by Kaiser and that, therefore, there was no earlier “delivery” within the meaning of section 6396. We agree with Chevron.
 

 Under the plain language of regulation 1620, a sale is exempt under section 6396 “[i]f title to the property sold passes to the purchaser at a point outside this state . . . .” (Reg. 1620, subd. (a)(1).) The exemption is lost only if
 
 “the property is delivered to the purchaser or the purchaser's representative in this
 
 state” or, stated the other way,
 
 “is not delivered outside this state.’"
 
 (Reg. 1620, subd. (a)(3)(A), italics added.) As used in section 6396, “delivery” is not synonymous with “passage of title” to the goods (although the two may occur at the same time). Rather, it is a term of art denoting the point at which ownership is transferred, and the goods are no longer the property of the seller.
 
 (Satco, Inc.
 
 v.
 
 State Bd. of Equalization, supra,
 
 144 Cal.App.3d at p. 17.) Based upon the undisputed facts of this case, there is no support for the Board’s claim (or the trial court’s conclusion) that “delivery” occurred when Kaiser took over and completed the construction of Platform Gail.
 

 
 *297
 
 When Chevron exercised its right to terminate Atkinson, Chevron did not enter onto the worksite and complete Platform Gail on its own. It did not move the partially built platform from the worksite. Atkinson did not abandon work on the platform. Indeed, Chevron did nothing to suggest it was taking possession or title or control of Platform Gail. To the contrary, Chevron arranged for Atkinson’s employees to remain on the site until a substitute construction firm was retained, and entered an interim agreement with Atkinson for Atkinson’s continued performance of specified construction work on Platform Gail
 
 after
 
 the Chevron-Atkinson contract was terminated. By this means, Chevron mitigated the damages it suffered by reason of the delay caused by the transition from Atkinson to Kaiser and, as part of the same interim agreement, arranged for Atkinson to retain responsibility for the security of the worksite until Kaiser was ready to step in. What this means is that Atkinson did not abandon Platform Gail, and that Chevron did not take possession of it.
 
 [6]
 

 The Board points to the fact that, at the time the Chevron-Atkinson contract was terminated, Atkinson canceled the insurance coverage it was required to carry under the terminated contract and Chevron obtained its own insurance. So what? Chevron at all times retained a security interest in the partially completed platform and the materials located at the worksite, and the Board offers no authority to support its suggestion that Chevron’s purchase of insurance to protect that limited interest means it took delivery or possession of or title to the property in which it had the security interest. As a practical matter, Atkinson remained on the job until Kaiser took over and completed it, and Chevron did not take possession of Platform Gail until it was completed and delivered by the carrier to the offshore site. Any other conclusion would eviscerate the intent of section 6396.
 
 [7]
 

 To avoid this result, the Board relies on two cases,
 
 Engs Motor Truck Co.
 
 v.
 
 State Bd. of Equalization, supra,
 
 189 Cal.App.3d 1458, and
 
 Pope
 
 v.
 
 State Bd. of Equalization
 
 (1988) 202 Cal.App.3d 73 [248 Cal.Rptr. 246]. Both cases are factually inapposite. In
 
 Engs,
 
 trucks were sold for shipment by a carrier to the buyer in Arizona but, as was
 
 conceded,
 
 they were delivered in California. The issue on appeal was whether delivery outside the state had to occur for the exemption of section 6396 to apply which, not surprisingly, the
 
 *298
 
 court held it did.
 
 (Engs Motor Truck Co.
 
 v.
 
 State Bd. of Equalization, supra,
 
 189 Cal.App.3d at pp. 1468, 1471-1472.) In
 
 Pope,
 
 motor homes were sold for shipment by a forwarding agent to out-of-state buyers. The seller delivered the motor homes to the forwarding agent who delivered them to the purchasers in California, who then drove them out of state. On these undisputed facts, the court once again held that the exemption could not be claimed.
 
 (Pope
 
 v.
 
 State Bd. of Equalization, supra,
 
 202 Cal.App.3d at pp. 78, 83-84.)
 

 In our view, this case is unlike
 
 Engs
 
 and
 
 Pope
 
 because, in the first instance, the property at issue was not moved at the time Chevron switched contractors and, in the second instance, because the issue of “deliver”
 
 was
 
 contested here but not in those cases.
 
 [8]
 
 As we have explained, the facts of our case all point away from a delivery to Chevron at any time prior to the admittedly proper offshore installation of Platform Gail. All that happened here was a change in contractors, not an abandonment or anything else to support the Board’s claim that Chevron took possession of the platform at the time of that change or to establish the nexus required by the interstate commerce clause. Since there is nothing in the statute or the regulations to preclude reliance on this exemption simply because there is a change in contractors, the exemption applies and no taxes were due for the sale of Platform Gail.
 

 Disposition
 

 The judgment is reversed and the cause is remanded to the trial court with directions to enter a new judgment in favor of Chevron. Chevron is entitled to its costs of appeal.
 

 Spencer, P. J., and Ortega, J., concurred.
 

 [1]
 

 This action was tried on stipulated facts, documents related to those facts, and the uncontroverted testimony of one witness. Accordingly, the material facts are not disputed, and we are able to omit from our summary all irrelevant details (such as the names of predecessor entities and other, equally scintillating information). Unfortunately, no one has told us the one thing we would really like to know—how it came to be that Platform Gail got her name.
 

 [2]
 

 All section references are to the Revenue and Taxation Code.
 

 [3]
 

 The contract price could increase based upon change orders made in accordance with the contract. With or without change orders, the contract provided for progress payments over the term of the contract and, as security for amounts paid by Chevron to Atkinson prior to Chevron’s acceptance of Platform Gail, Atkinson gave Chevron a security interest in all materials and equipment purchased or fabricated under this agreement.
 

 [4]
 

 Chevron had the right to terminate Atkinson’s performance at any time, by written notice specifying the extent to which work was terminated and the effective date of termination. Upon such termination, Chevron was required to compensate Atkinson for work done and materials provided to the date of termination.
 

 [5]
 

 All references to regulations are to title 18 of the California Code of Regulations.
 

 [6]
 

 As the Board concedes, Chevron’s renewal of the worksite lease in its own name is irrelevant, as this fact has nothing to do with the passage of title to Platform Gail (reg. 1620, subd. (a)(1)) or its delivery (reg. 1620, subd. (a)(3)(A)) within this state.
 

 [7]
 

 At oral argument, the Board conceded that, had Chevron been obligated under its original contract with Atkinson to lease the worksite and obtain the insurance, those obligations would not have affected Chevron’s exemption under section 6396. Given that concession, we fail to see how Chevron’s later assumption of responsibility for the lease or the insurance could have any effect on its claim of exemption.
 

 [8]
 

 In
 
 Engs
 
 and
 
 Pope,
 
 the legal conclusion of delivery within this state was conceded. In our case, the underlying facts are conceded but their legal conclusion is not.